Raymond A. Erwin v. Commissioner.
Erwin v. Commissioner
Docket No. 51367.
United States Tax Court
T.C. Memo 1956-44; 1956 Tax Ct. Memo LEXIS 252; 15 T.C.M. (CCH) 195; T.C.M. (RIA) 56044; February 24, 1956
*252 George O. Philips, Esq., Fidelity-Philadelphia Trust Building, Philadelphia, Pa., and William B. Farran, Esq., for the petitioner. William G. Handfield, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in the income tax of petitioner for the year 1947 in the amount of $43,525.16, plus an addition to tax for fraud in the amount of $21,762.58. The issues are: (1) Did the respondent err in his determination that the petitioner received income in 1947, in connection with used-car sales of Erwin Chevrolet, Inc. and R. A. Erwin Motor Co., Inc., which he failed to report on his income tax return for that year, and, if not, (2) was any part of the deficiency due to fraud with intent to evade tax. Findings of Fact Petitioner is a resident of Philadelphia, Pennsylvania. He filed his income tax return for the year 1947 with the then collector of internal revenue for the first district of Pennsylvania. Petitioner has been engaged in the business of selling automobiles for approximately 38 years. Erwin Chevrolet, Inc. is a Pennsylvania corporation. Throughout the year 1947 it held a franchise from General *253 Motors Corporation to sell new Chevrolet automobiles in the City of Philadelphia at its place of business, which was originally located at Broad and Grange Streets and was later transferred to 6000 North Broad Street. At the beginning of 1947 it had two stockholders, the petitioner and William J. Gibbons, Jr., each of whom owned 50 per cent of its voting stock. There was also nonvoting preferred stock held in the same proportions. Gibbons died on April 29, 1947, and thereafter, pursuant to a testamentary trust, his stock was held by the Second National Bank of Philadelphia and Helen C. Gibbons, his widow, as trustees. Prior to his death, the directors of Erwin Chevrolet, Inc. were the petitioner, William J. Gibbons, Jr., and the corporation's attorney, Vincent P. McDevitt. After the death of William J. Gibbons, Jr., Helen C. Gibbons was substituted for him on the board of directors and remained a director throughout the remainder of the year 1947. Until the death of Gibbons, the officers of the corporation were petitioner, president, Alice E. Erwin (petitioner's wife), vice-president, and William J. Gibbons, Jr., secretary and treasurer. Helen C. Gibbons became secretary and treasurer *254 after her husband's death. Petitioner was the active managing head of Erwin Chevrolet, Inc. Neither William J. Gibbons, Jr., nor Helen C. Gibbons participated in the management of the business; however, their son Joseph A. Gibbons worked at Erwin Chevrolet, Inc., learning the business and generally looking after the interest of his family by reason of its investment in the enterprise. R. A. Erwin Motor Co., Inc. is a Pennsylvania corporation. Throughout the year 1947 it held a franchise from General Motors to sell new Chevrolet automobiles and new Oldsmobile automobiles in the City of Philadelphia at its place of business located at 9330 Bustleton Avenue. During 1947 it had three stockholders and directors - Raymond A. Erwin, Alice Erwin, and their son, Howard R. Erwin, each of whom owned approximately one-third of its stock. Throughout 1947 its president was petitioner, its vice-president Alice Erwin, and its secretary and treasurer Howard R. Erwin. As president and a director of Erwin Chevrolet, Inc. and R. A. Erwin Motor Co., Inc., petitioner exercised a controlling influence on the policies of these two companies. However he actively managed only Erwin Chevrolet, Inc.; his *255 son Howard was the general manager at R. A. Erwin Motor Co., Inc. Both Erwin Chevrolet, Inc. and R. A. Erwin Motor Co., Inc., throughout 1947, acquired used automobiles in trade as part of the purchase price of new automobiles sold by them. Except for casual variations, both companies, throughout 1947, followed the practice of selling such used cars at wholesale to used car dealers, rather than of selling them at retail to ultimate purchasers. Substantially all transactions between wholesale purchasers of used cars and the two companies were effected in cash. The use of cash was in 1947 the established custom of that business. Used cars acquired by Erwin Chevrolet, Inc. and R. A. Erwin Motor Co., Inc. during 1947 were sold primarily to Grundy and Wampole, Joseph W. Cragin, Inc., and Edward Heller. Several other used car dealers and individuals also purchased small numbers of used cars from the two Erwin companies during that year. Both Erwin companies maintained a set of books according to the accounting system prescribed by General Motors Corporation wherein they segregated the gross proceeds from the sale of used cars. During the year 1947 it was the practice of Erwin Chevrolet, *256 Inc. to seek bids on groups of used cars from used car dealers. After bids were received by Erwin Chevrolet, the automobiles involved were usually sold to the highest bidder. Sidney Greenberg was used car manager of Erwin Chevrolet, Inc., from 1940 until May 2, 1947. He resigned on the latter date. During his employment as used car manager, Greenberg examined used cars taken in trade, determined their value for trade-in purposes, and thereafter, after consultation with petitioner, arranged to sell them in a group to used car dealers. As a general rule the highest bid was accepted. When used cars were placed in a group and offered for sale, Greenberg would receive the bids from most of the used car dealers. However, John F. Grundy (on behalf of Grundy and Wampole) usually made his bids directly to petitioner, and not to Greenberg. When the successful bidder was determined, an order, on an Erwin Chevrolet, Inc. "Used Car Contract" form, was made out for the cars sold. Petitioner "set" the prices that were entered on the order and these prices were less than the amounts received from the successful bidder. The bookkeeper was given the amount of money reflected on the order and the excess, *257 when Greenberg received the sales price, was turned over to the petitioner. Greenberg kept a personal record in a small book showing the name of each purchaser, the sales price which was recorded on the order and in the books of Erwin Chevrolet, Inc., and the amount received in excess of the price so recorded. On sales made by petitioner, the entries in Greenberg's book were based on information as to the sales received by him from the petitioner. At one time when petitioner was on a vacation, Greenberg collected some money representing excess payments for used cars not entered on orders and turned it over to Joseph A. Gibbons. At that time Greenberg told Gibbons he was keeping a record because he was turning all the money over and was not getting a receipt for it. Edward Heller purchased only one car from Erwin Chevrolet, Inc. during the period Greenberg was its sales manager, and Greenberg did not handle this sale. After Sidney Greenberg resigned on May 2, 1947, petitioner acted as used-car sales manager of Erwin Chevrolet, Inc., for about two months. During May and June, Howard R. Erwin, son of petitioner and general manager of R. A. Erwin Motor Co., Inc., spent some time at Erwin *258 Chevrolet, Inc. training Joseph A. Gibbons to succeed Greenberg. In July or August of 1947, Gibbons became used-car sales manager and acted as such for the remainder of the year. During the period from January 17, 1947, to March 3, 1947, petitioner was on a vacation trip to Florida. He did not return to Philadelphia at any time during this period. John F. Grundy was in the business of buying and selling used cars and during the year 1947 was engaged in the business with William Wampole under the name of Grundy and Wampole, partners. During 1947 Grundy purchased the used cars which were sold by the partnership. In order to obtain these cars, it was necessary for him to call frequently at the places of business of Erwin Chevrolet, Inc. and R. A. Erwin Motor Co., Inc. In purchasing cars from Erwin Chevrolet, Inc., he submitted bids for certain cars to be sold in a group. Other used car dealers also submitted bids. When Grundy's bid was accepted, he paid cash and received title to the cars. He did not ask for or receive any receipts for cash payments because he was interested only in receiving the cars and their titles. All of his purchases from Erwin Chevrolet, Inc. during 1947 were *259 made on or prior to June 27, 1947, with the exception of one which was made on August 15, 1947. During most of the period in 1947 when he made these purchases, Grundy did business with, and made cash payments for cars to, the petitioner, but in the latter part of the year, after Joseph Gibbons succeeded Sidney Greenberg as sales manager, he occasionally did business with Gibbons. He kept a book in which he recorded, among other things, purchases of used cars, their serial numbers, the amounts paid therefor, the dates of purchase, and the names of the vendors. Erwin Chevrolet, Inc. sold the following used cars which its books and records list as having been sold to Grundy and Wampole, but which are not recorded as having been purchased on the book of Grundy and Wampole: Date
Type Car
Serial No.
Amount
2/28/47
1940 Chevrolet Sedan
14KA0119846
$ 625.00
5/ 5/47
1941 Ford Coupe
EAM67199
550.00
6/16/47
1941 Chevrolet Sedan
2AH0355494
875.00
$2,050.00
Grundy and Wampole's book lists the following used cars as having been purchased from Erwin Chevrolet, Inc. but these automobiles are not listed as sold on the books of Erwin Chevrolet, Inc.: *260 Date
Type Car
Serial No.
Amount
5/ 5/47
1941 Ford Two Door
185931504
$ 775.00
8/15/47
1937 Plymouth
10334978
400.00
$1,175.00
Transactions involving 48 used cars other than those listed above appear on the records of both Erwin Chevrolet, Inc. and Grundy and Wampole. The books of Erwin Chevrolet, Inc. show that these 48 used cars were sold to Grundy and Wampole during 1947 for the total amount of $32,200. The total amount paid by Grundy and Wampole to Erwin Chevrolet, Inc. for the 48 cars was $39,575. During the year 1947 Joseph W. Cragin, Inc., a Pennsylvania corporation, was engaged in the business of buying and selling used cars in Philadelphia. Joseph W. Cragin and his wife each owned 50 per cent of its stock. It kept records showing the amounts paid for used cars, their serial numbers, and the amounts received when they were sold. Joseph W. Cragin (on behalf of Joseph W. Cragin, Inc.) during 1947 bid on groups of used cars offered for sale by Erwin Chevrolet, Inc. in competition with other used car dealers. If Cragin was the successful bidder he paid cash and received the cars and the titles thereto in exchange. He never asked for receipts *261 or memoranda of sales. Cragin made the cash payments for cars purchased from Erwin Chevrolet, Inc. to Sidney Greenberg, the used car sales manager of Erwin Chevrolet, Inc., or to Joseph A. Gibbons, who succeeded Greenberg. He did not deal with the petitioner. Erwin Chevrolet, Inc. sold the following used cars which its books list as having been sold to Joseph W. Cragin, Inc. but those cars are not recorded as having been purchased on the books of the latter: Date
Type Car
Serial No.
Amount
3/12/47
1941 Dodge Sedan
30394883
$ 725.00
3/12/47
1941 Chevrolet Sedan
14AH0551923
710.00
3/12/47
1941 Chevrolet Coupe
14AH0444366
715.00
8/29/47
1942 Chevrolet Coupe
14BG118450
950.00
8/29/47
1940 Plymouth Sedan
11115954
775.00
$3,875.00
Joseph W. Cragin, Inc.'s books list the following used cars as having been purchased from Erwin Chevrolet, Inc. but they are not listed as having been sold on the books of Erwin Chevrolet, Inc.: Date
Type Car
Serial No.
Amount
4/29/47
1936 Chevrolet
14FA0739632
$ 230.00
7/ 1/47
1938 Ford Coupe
184594241
250.00
7/ 1/47
1934 Plymouth Coach
1033100
400.00 $99/ 3/47
1942 Chevrolet
14BH1112664
1,050.00
7/16/47
1946 Chevrolet
14DKK22955
1,650.00 *
$3,580.00
*262 Eighty-five cars appear on the records of Erwin Chevrolet, Inc. as having been sold to Cragin in 1947, and on the records of Cragin as having been purchased from Erwin Chevrolet, Inc. during that year. The records of Erwin Chevrolet, Inc. show that these 85 cars were sold to Cragin for the total amount of $60,052.40. Cragin paid Erwin Chevrolet, Inc. the total amount of $71,935 for the 85 cars. Adkins-Nash Company was engaged in the business of buying and selling used cars in 1947 on Broad Street in Philadelphia. This company has discontinued this business and its records are no longer available. The books and records of Erwin Chevrolet, Inc. show the sale of two used cars to Adkins-Nash on January 20, 1947, for $765. Adkins-Nash paid Erwin Chevrolet, Inc. $1,435 for these cars. The sales prices of the aforesaid 48 cars (sold to Grundy), 85 cars (sold to Cragin), and 2 cars (sold to Adkins-Nash), as they appear on the books of Erwin Chevrolet, Inc., are in the aggregate amount of $93,017.40, whereas the purchasers actually paid a total of $112,945 therefor; there was thus an understatement *263 of 21.42 per cent with respect to these sales. Edward Heller was engaged in the business of buying and selling used cars at 9400 Bustleton Avenue, Philadelphia, Pennsylvania, during the year 1947. During that year he submitted bids on groups of cars at Erwin Chevrolet, Inc. in competition with other dealers. If his bid was accepted Heller paid cash for the cars to Joseph A. Gibbons. Joseph Reedman sometimes acted as agent for Heller. With the exception of one purchase of a 1946 Chevrolet on April 17, 1947 for $1,350, all of Heller's purchases of used cars at Erwin Chevrolet, Inc. during 1947 were made subsequent to May 15, 1947. During the year 1947 Heller purchased 85 used cars from Erwin Chevrolet, Inc. and, according to its books and records, the total amount paid therefor by Heller was $76,220. Heller did not keep any books and records during 1947. On September 30, 1947, Albert Lauff purchased a 1940 Chevrolet Coupe from Erwin Chevrolet, Inc. He paid $700 for this used car, which was the sales price shown on the books of Erwin Chevrolet, Inc. Ogontz Motors purchased nine used cars from Erwin Chevrolet, Inc. during 1947. The books and records of Erwin Chevrolet, Inc. show *264 that it sold the nine used cars for $5,650 and Ogontz Motors paid this amount for these cars. In addition to the sales listed above, the books and records of Erwin Chevrolet, Inc. show miscellaneous sales of 42 used cars during 1947 to twelve dealers and other persons for the total amount of $30,363.65. According to the books and records of Erwin Chevrolet, Inc. for the year 1947, the total amount of its gross sales of used cars for that year was $211,876.05. Howard R. Erwin was the general manager of R. A. Erwin Motor Co., Inc. during 1947 and handled the sales of used cars made by it. Whenever he was not present, his assistant, a Mr. Roberts, handled the sales. Petitioner did not participate in these sales. The only amounts received by petitioner from R. A. Erwin Motor Co., Inc. during 1947 were a salary of $2,500 and rent for property owned by him and his wife which was used by the corporation. He did not receive any portion of amounts paid to the corporation by used-car dealers and others in excess of amounts shown on its books as having been received from sales of used cars made to them during 1947. Most of the used-car sales of R. A. Erwin Motor Co., Inc. in 1947 were made *265 to Edward Heller, and it did not usually use the system employed by Erwin Chevrolet, Inc. of getting bids from several used-car dealers and accepting the highest bid. During 1947 John F. Grundy purchased 29 used cars from R. A. Erwin Motor Co., Inc. Three of these purchases are not reflected on the records of Grundy. The books and records of R. A. Erwin Motor Co., Inc. show that the remaining 26 cars were sold to Grundy for the total amount of $22,865. Grundy paid R. A. Erwin Motor Co., Inc. for these 26 cars the total amount of $26,940. In making these purchases, Grundy dealt with Howard R. Erwin and made cash payments for the used cars to him. During 1947 Joseph W. Cragin, Inc. purchased five used cars from R. A. Erwin Motor Co., Inc. The Erwin Company's books and records show that the five cars were sold to Cragin for the total amount of $3,700. Cragin paid R. A. Erwin Motor Co., Inc. the total amout of $4,175 for these five cars. The latter amount was paid in cash to Howard R. Erwin by Joseph W. Cragin at the time of the sales. During 1947 Edward Heller purchased 106 used cars from R. A. Erwin Motor Co., Inc. Its records show that these cars were sold to Heller for the total *266 amount of $89,905.95. Heller paid cash for his purchases and he dealt with Howard R. Erwin. During 1947 A. P. Lindsey purchased 6 used cars from R. A. Erwin Motor Co., Inc. Its books and records show that it sold these cars to Lindsey for the total amount of $5,112. He dealt with Howard R. Erwin, and either paid him for the cars or made payments at the office of R. A. Erwin Motor Co., Inc. On December 31, 1947, Benno Spreng purchased a 1947 Pontiac Sedan from R. A. Erwin Motor Co., Inc., and gave it his check for $2,250 in payment. This was the amount shown on its sales records. According to the books and records of R. A. Erwin Motor Co., Inc. for the year 1947, its gross sales of used cars for that year amounted to $126,602.95. Some time after the close of the year 1947, two representatives of the Internal Revenue Service were assigned to investigate the corporate returns of Erwin Chevrolet, Inc. and R. A. Erwin Motor Co., Inc. for that year, and also the returns of individuals connected with those corporations. In the course of their investigation they compared the sales prices for used cars shown on the books and records of the Erwin companies with the prices paid for these *267 cars in 1947 shown in the books of used car dealers who had kept records of their purchases. They ascertained that John F. Grundy, Joseph W. Cragin, Inc. and Adkins-Nash Company had such records which were then available and that other used-car dealers, except Ogontz Motors, either had no records or their records were not sufficiently complete. They compared the Grundy, Cragin and Adkins-Nash records with those of the Erwin companies and found discrepancies between the sales prices shown on the companies' books and the purchase prices on the Grundy, Cragin and Adkins-Nash records which led them to believe that the Erwin companies had understated the sales prices of used cars. In the case of Erwin Chevrolet, Inc., they determined that on sales made to Grundy, Cragin and Adkins-Nash the discrepancy amounted to $20,587.60, or 22.5 per cent of the sales to these dealers, and they applied this percentage to the balance of used car sales made to other dealers and individuals, and thus determined a further discrepancy of $22,317.25. In the case of R. A. Erwin Motor Co., Inc., they determined that on sales made to Grundy and Cragin the discrepancy amounted to $4,600, or 15.68 per cent of used *268 car sales made to them, and by applying this percentage to the total used car sales determined the amount of the understatement to be $19,851.34. They decided that the amount of the discrepancies determined in this manner for both corporations should be taxed to petitioner because he appeared to be in control of both corporations and because Grundy informed one of them that he had made payments for the used cars in cash to petitioner and Greenberg stated that the excess payments shown in his book record had been received by petitioner. The deficiency here in controversy results from the respondent's determination that petitioner received unreported income through Erwin Chevrolet, Inc. in the amount of $43,004.85 and through R. A. Erwin Motor Co., Inc. in the amount of $19,851.34. In the income tax return filed by the petitioner for the year 1947 he reported the receipt of compensation from Erwin Chevrolet, Inc. of $18,982.90 and from R. A. Erwin Motor Co., Inc. of $2,500.00, and rental income of $1,648.38. The sales prices of used cars sold by R. A. Erwin Motor Co., Inc. during 1947, with the exception of the sale to Benno Spreng, were understated on its books and records. No part *269 of its understated sales income for the year 1947 was received by petitioner during that year. The sales prices of used cars sold by Erwin Chevrolet, Inc. during 1947 to Ogontz Motors and Albert L. Lauff were accurately reflected on the books of Erwin Chevrolet, Inc. Sales by Erwin Chevrolet, Inc. to all other purchasers of used cars made during 1947 were understated on its books and records. The amount of the understatement with respect to these sales is to be determined by applying the percentage of the understatement (21.42 per cent, as determined above) in sales made to John F. Grundy, Joseph W. Cragin, Inc., and Adkins-Nash Company, to the total sales shown in the books of Erwin Chevrolet, Inc. for the year 1947, after eliminating the amounts of sales to Ogontz Motors and Albert Lauff. The figures to be used in making this computation are those heretofore set forth in these findings. Fifty per cent of the understatement thus determined was received by and is includible in the income of petitioner for the year 1947. Opinion RAUM, Judge: Petitioner was the president of Erwin Chevrolet, Inc., and R. A. Erwin Motor Co., Inc., and exercised a controlling influence on the policies *270 of these corporations during 1947. However, the evidence shows that he actively managed only the business of Erwin Chevrolet and that his son Howard managed the General Motors franchises to sell new automobiles, and it was the policy of each company in 1947 as far as possible to sell new cars only to such purchasers as would "trade in" used cars. At that time automobiles were in short supply, and the dealer was thereby enabled to make a profit on the sale of the used car as well as the new one. Most of the sales of used cars here involved were made to used car dealers. No question is raised with respect to the sales of new cars. The deficiency determined by the Commissioner is based on the theory that the sales of used cars were made at prices that were in fact higher than those reflected on the books of each of these companies, and that the excess found its way into the hands of petitioner. Upon checking the available records of used car dealers who purchased cars from the two Erwin companies the Government discovered substantial discrepancies between the amounts shown in such records as the cost of the cars to the used car dealers and the amounts appearing on the books of the Erwin *271 companies as the sales prices of such cars to those dealers. And the evidence presented in this proceeding convinces us that the sales prices of used cars entered on the books and records of the Erwin companies did not in most instances reflect the full amounts paid by the purchasers. Inasmuch as the books and records were unreliable, the Commissioner was justified in determining the amount of income from sales of used cars by other reasonable means. After ascertaining the percentage of income not reported by each of the Erwin companies, with respect to cars sold to the dealers who kept records of amounts paid for used cars, he applied this percentage to the total used-car sales and thus arrived at the amount of the understated income. This method of determining the income from sales appears to be reasonable as far as the corporations are concerned. But the question before us is not whether the corporations received income in excess of the amounts recorded on their books as receipts from the sales of used cars. The deficiency results from respondent's determination that the excess was received by the petitioner and that he should have reported it in his return for 1947. A presumption *272 of correctness attaches to this determination and the burden is on the petitioner to overcome this presumption. The respondent has also determined that part of the deficiency is due to fraud with intent to evade tax, and he has the burden of proving fraud by clear and convincing evidence. Petitioner testified that he did not receive any unreported income from either of the two Erwin companies. We think that the evidence supports him with respect to sales made by R. A. Erwin Motor Co., Inc. His son Howard was the operating head of that company, and there is nothing in the evidence that links petitioner with the excess payments received by Howard on the sales of used cars. We conclude that the Commissioner erred in attributing any such amounts to petitioner. The evidence with respect to sales by Erwin Chevrolet, Inc., however, reveals a different picture. There was persuasive evidence not only that there was a pattern of doing business whereby sales were made at prices in excess of those shown on the company's books, but also that at least part of the excess found its way into petitioner's hands. This evidence was by no means uncontradicted; the record before us is replete with conflicting *273 testimony. We are satisfied that neither side has carried its burden of proof - that, subject to certain adjustments required by our findings, petitioner has not shown the Commissioner to be in error in his determination of deficiency with respect to sales made by Erwin Chevrolet, and that the Government has not established fraud by clear and convincing evidence. The trial was a long one, and it would be futile to attempt to review all the evidence. Two of the used car dealers who appeared as witnesses, Grundy and Cragin, convincingly testified as to the prices paid by them, [1] and their testimony was buttressed by that of Sidney Greenberg who had been sales manager of Erwin Chevrolet until May 2, 1947. The testimony of all three was further confirmed by contemporary records maintained by Grundy and Cragin, as well as by a small personal memorandum book kept by Greenberg. [2] Moreover, both Greenberg and Grundy testified unequivocally as to payments of excess cash to the petitioner. Petitioner vigorously attackes the testimony of Greenberg, Grundy and Cragin, and challenges the records kept by them. It is true that there were some discrepancies in their testimony, that Greenberg's *274 testimony at times was loose, and that some of the evidence raised almost as many questions as it answered. But we do not agree with petitioner that these witnesses were lacking in credibility. We heard them for extended periods on the witness stand and are satisfied as to the truthfulness of the evidence of all three that substantial amounts in excess of that appearing on the Erwin Chevrolet records were paid for used cars, and of the evidence of two of them that, except when petitioner was away on vacation, the money was paid to petitioner. Although the details of this testimony leave much to be desired, we are nevertheless persuaded that in the main it is substantially accurate. In the circumstances, we cannot accept petitioner's categorical denial that he never received any amounts in excess of those shown by the records of Erwin Chevrolet. Nor are we satisfied by any other evidence presented by him, including the testimony of an impressive array of character witnesses, that we must put aside the testimony of Grundy, Cragin and Greenberg as unworthy of belief. *275 However, the evidence before us does show that Joseph A. Gibbons was familiar with the practice of obtaining cash in excess of that appearing on the company's books, and indeed, when petitioner was away, such cash was paid to Gibbons. Notwithstanding the denials of Gibbons we find that evidence credible. But Gibbons informally represented his family's fifty per cent stock interest in the company, and we think it highly unlikely that he would have permitted petitioner to retain the entire excess to the disadvantage of his own family. Upon the basis of all the evidence before us it is our best judgment that petitioner retained only one-half of the excess and our findings reflect that conclusion. As to that one-half, we must conclude that petitioner has failed to carry his burden of proof. We hold that he is liable for a deficiency with respect to one-half of the unreported income arising from sales of used cars by Erwin Chevrolet, determined by the method employed by respondent, but with such adjustments as are required by our findings. At the same time, we must also hold, in view of the state of the record, that the respondent has not sustained his burden of proving by clear and *276 convincing evidence that a part of the deficiency was due to fraud with intent to evade tax. We recognize that the disposition of this case upon such failures to meet burdens of proof may not be a wholly satisfying one. Yet, in view of the record before us we cannot conscientiously conclude that either side has carried its burden. Such disposition is not novel. In (C.A. 6), the Court of Appeals said: "That the difference in the burden of proving ordinary tax deficiencies and civil fraud can have important practical results has long been recognized. 'As to the issue raised by [the Commissioner's] determination of fraud the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside.' . 'The failure of the taxpayer to overcome the presumptive correctness of the deficiency, as is true in the case at bar, does not create a presumption of fraud. Both parties *277 in a proceeding of this nature may fail through inadequate proof on the several issues.' Para. 49, 254 P-H TC Memo., Docket No. 15004, 10-11-49. See Para. 53,072 P-H TC Memo., Docket No. 32383, 3-5-53; ; ; ." Decision will be entered under Rule 50. Footnotes
*. This car is, however, on the books of Erwin Chevrolet, Inc. as a new car sale.↩
1. The used cars of the Erwin companies were sold in 1947 primarily to Grundy, Cragin and Heller. Heller appeared as a witness also; his testimony did not inspire confidence; he had no records, and his testimony was so general that, in the absence of records, it was not helpful to us. ↩
2. The prices shown in Greenberg's memorandum book were not precisely the same as those in Grundy's and Cragin's records. Nevertheless, there was a strong correlation between those prices, and the differences between Greenberg's memorandum book on the one hand and Grundy's and Cragin's records on the other hand were in general not of such magnitude as to persuade us that the substantially lower figures on the Erwin Chevrolet books were correct.↩